61 F.3d 900
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
David H. HILLIARD; Barbara Jean Hilliard, Plaintiffs-Appellants,
v.
MANITOWOC COMPANY, INCORPORATED, Defendant-Appellee,
and
COASTAL STATES EQUIPMENT COMPANY, INCORPORATED; S & A Crane
and Rigging, Incorporated; Ray J. Boudreaux; Arc
Equipment Sales, Rental and Parts of
Louisiana, Incorporated, Defendants,
and
INTERNATIONAL PAPER COMPANY, Third Party Defendant.
 No. 94-2430.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 7, 1995.
Decided: July 25, 1995.
 
 ARGUED: Richard Neill Watson, Pulley, Watson, King & Lischer, P.A., Durham, NC, for Appellant. Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, L.L.P., Charleston, SC, for Appellee. ON BRIEF: Stephen P. Groves, Young, Clement, Rivers & Tisdale, L.L.P., Charleston, SC, for Appellee.
 Before WILKINSON, HAMILTON, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants David and Barbara Hilliard brought this diversity tort action against several defendants following an accident with a construction crane in South Carolina. The district court granted judgment as a matter of law (JMOL) for the crane manufacturer, appellee Manitowoc, Inc., on a claim of strict products liability. The remaining claims went to the jury, which awarded substantial damages against one of the other defendants, but rejected plaintiffs' additional claims against Manitowoc. Appellants now challenge both the JMOL and the jury verdict for Manitowoc. We affirm the judgment of the district court.
 
 I.
 
 2
 The 4100-W Series crane that is the focus of this products liability case was manufactured by Manitowoc in 1977. It was owned by A.C.R. Equipment Sales, Rental, and Parts of Louisiana, Inc. ("ACR"), who leased it to the plaintiff David Hilliard's employer, PAPCO Corporation, in 1989. Coastal States Equipment Co. was the entity responsible for inspecting, servicing, and repairing the crane.
 
 
 3
 This particular crane was designed for heavy construction work. It consisted of an operator's cab and a fixed lattice boom about two hundred and thirty feet long that ran the main hoist line. At the top of the main boom was an additional, secondary boom called the jib boom. It ran a "jib line" that was separate from the main line and was used for lifting smaller objects. Attached to the end of the jib line was a hook and two heavy metal weights called "headache balls."
 
 
 4
 The 4100-W crane did not have a safety mechanism known as an anti-two-blocking device ("ATB"). "Two-blocking" or "doubleblocking" is a common danger is crane operations. It happens when a cable line is retracted too far, and the "block" on the end of the line encounters the tip of the crane's boom. Because the tensile strength of the cable is so high, either the boom of the crane or the block at the end of the cable must give way. An anti-two-blocking device prevents this from happening by cutting off the crane's power if the line gets too close to the tip of the boom. Both Hilliard and PAPCO were aware of the dangers of two-blocking, and it is undisputed that everyone knew this crane lacked an anti-two-blocking device.
 
 
 5
 Hilliard was operating the crane at a PAPCO worksite in Georgetown, South Carolina on March 13, 1990, when a double-blocking event occurred. Hilliard was using the main hoist of the crane to lift a large boiler from a railroad car. As he activated the main hoist, the separate jib line began running up by itself. Hilliard, following standard procedure, was watching the main line and did not notice the malfunction in the jib line. When the end of the line and the attached headache balls ran up against the tip of the jib boom, the jib snapped and the headache balls broke off the end of the line, falling several hundred feet and crashing into the cab of the crane. Hilliard was badly injured.
 
 
 6
 Upon inspecting the crane, it was discovered that the jib line malfunction was caused by a fault in the valves of the rear drum hoist control assembly. Manitowoc had previously issued a "Series II conversion" kit through its dealers to replace these control valves. In 1988, Coastal obtained the replacement parts for the crane at issue here. It represented to the crane's owner and to Manitowoc that these parts were installed when in fact no such repairs took place. In reliance on this representation, Manitowoc issued a "builder's plate" indicating that the crane had been upgraded to a Series II.
 
 
 7
 In 1993, Hilliard and his wife brought this action against Manitowoc, ACR, Coastal, and several other parties. They pressed three main theories of liability against Manitowoc. First, they argued that Manitowoc was strictly liable for failing to include an anti-twoblocking device. Second, they contended that Manitowoc was liable under negligence and warranty theories for the malfunction in the valve assembly. Finally, they argued that Manitowoc was responsible for Coastal's tortious conduct in fraudulently representing that the Series II repairs had been done.
 
 
 8
 The case was tried to a jury in August, 1994. All three claims against Manitowoc were rejected--the first by the court on a motion for judgment as a matter of law, and the latter two by the jury. Rather, the jury singled out Coastal States as the party that was truly responsible for the accident. The jury awarded the Hilliards more than five million dollars in damages against Coastal, including $5,167,529 for David Hilliard and $150,000 for his wife Barbara. Plaintiffs then moved to set aside the jury verdict for Manitowoc, or for a new trial. The trial court denied that motion. Plaintiffs now appeal the rejection of their claims against Manitowoc.
 
 II.
 
 9
 We begin with appellants' argument that the district court erred in refusing to set aside the jury's verdict for Manitowoc. Appellants claim that there was insufficient evidence to support the jury's finding that Manitowoc did not breach an implied warranty of merchantability. They raise the same objection to the jury's conclusion that Coastal was not acting as the agent of Manitowoc. In reviewing challenges to the sufficiency of the evidence, we must decide whether, viewing the evidence in the light most favorable to Manitowoc, the result reached by the jury was a reasonable one. See Duke v. Uniroyal, Inc., 928 F.2d 1413, 1417 (4th Cir.), cert. denied, 502 U.S. 963 (1991). There is ample basis for the jury verdict in this case.
 
 A.
 
 10
 First, plaintiffs maintain that the evidence supported their claim of breach of implied warranty. To show such a breach, plaintiffs were required to establish that the goods at issue were defective at the time they were sold. Doty v. Parkway Homes Co., 368 S.E.2d 670 (S.C.1988). A product is "defective" if it is not reasonably fit for the ordinary purposes for which it is used. Livingston v. Noland Corp., 362 S.E.2d 16, 19 (S.C.1987). The manufacturer is not liable, however, if the defective condition was created by "subsequent mishandling or other causes" such as misuse or improper maintenance. S.C.Code Sec. 15-73-30 (1976). See also Claytor v. General Motors Corp., 286 S.E.2d 129 (S.C.1982).
 
 
 11
 Here, plaintiffs' warranty claim focused primarily on the defective condition of the valve assembly. Viewing the evidence in the light most favorable to Manitowoc, it was entirely reasonable for the jury to conclude that the valves were not faulty at the time of manufacture, but were old, worn, and in a state of disrepair at the time of the accident. The crane was manufactured in 1977. The valves were supposed to have been repaired by Coastal in 1988, but Coastal failed to repair them. Plaintiffs' own experts testified that replacing the valves at that time probably would have prevented the accident. Moreover, there was uncontroverted proof that the valve assembly was missing screws and that the control valves had been switched or altered. These changes occurred since the product left Manitowoc's control, meaning that the crane was not defective at the time of sale. The jury clearly believed that the flaw in the controls was the fault of Coastal, not Manitowoc, and assigned blame accordingly. This was a reasonable conclusion.
 
 
 12
 Plaintiffs, however, argue further that the lack of an ATB device, together with the flaw in the control valves, amounted to a violation of the implied warranty. Yet they fail to explain how this combination could render Manitowoc liable if neither factor individually was a "defect" attributed to the manufacturer. It was not unreasonable for the jury to conclude, as the trial court also did, that the lack of an ATB device did not constitute a "defect." Manitowoc introduced extensive evidence showing that the crane conformed to all relevant industrial standards at the time of its manufacture. There was also testimony regarding the dangers of two-blocking and how such accidents could be avoided without an ATB device. In sum, there was more than adequate evidence to sustain the jury's rejection of plaintiffs' warranty claim.
 
 B.
 
 13
 Second, plaintiffs contend that the jury erred in finding that Manitowoc was not responsible for Coastal's failure to repair the valves. The critical factor in determining agency under South Carolina law is the right of control of the principal over the performance of work and the manner in which it is done. Felts v. Richland County, 400 S.E.2d 781 (1991). Such factual issues of agency are classic jury questions. See, e.g., Gamble v. Stevenson, 406 S.E.2d 350 (S.C.1991).
 
 
 14
 The jury in this case reasonably concluded that Coastal was a nonagent independent contractor of Manitowoc. Plaintiffs relied primarily on Manitowoc's internal rules governing crane inspection procedures to argue that anyone who conducted such inspections had to be an agent of Manitowoc. The defendant, however, introduced contrary evidence showing that these rules also allowed non-agent dealers to do such work. Moreover, there was no specific evidence that Manitowoc exercised any control over Coastal's activities.
 
 
 15
 Manitowoc relied on Coastal's statements that the repairs to the crane had been done. It is clear that Manitowoc was as much a victim of Coastal's deceptions as everyone else. The jury's decision to impose liability for this accident solely on Coastal was a reasonable one and supported by the evidence.
 
 III.
 
 16
 Next, appellants challenge the grant of judgment as a matter of law on the question of strict liability for Manitowoc's failure to include an ATB device on the crane. The district court found that the lack of such a safety mechanism did not render the crane defective or unreasonably dangerous. Review of the trial court's decision is de novo. Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir.1992).
 
 
 17
 As with breach of warranty claims, the doctrine of strict liability in South Carolina requires proof that the product at issue was defective. S.C.Code Sec. 15-73-10 (1976). It must also be "unreasonably dangerous to the user, given the conditions and circumstances that foreseeably attend the use of the product." Claytor, 286 S.E.2d at 132; S.C.Code Sec. 15-73-10. A product may be deemed "unreasonably dangerous" if it is hazardous "to an extent beyond that which would be contemplated by the ordinary purchaser." Purvis v. Consolidated Energy Products Co., 674 F.2d 217, 222 (4th Cir.1982). Thus, "if the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." S.C.Code Sec. 15-73-20 (1976).
 
 
 18
 The failure to include a safety device may support a claim of strict liability, but the simple fact that a product could be made safer does not automatically render it defective or unreasonably dangerous. Marchant v. Mitchell Distributing Co., 240 S.E.2d 511, 513 (S.C.1977). Rather, the inquiry remains whether the failure to incorporate a safety mechanism makes the product unreasonably dangerous. Id. Courts may consider "the usefulness ... of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of the danger." Claytor, 286 S.E.2d at 132. In design defect cases such as this one, "state of the art and industry standards" are also probative in determining whether the product was unreasonably dangerous. Reed v. Tiffin Motor Homes, Inc., 697 F.2d 1192, 1196-97 (4th Cir.1982).
 
 
 19
 Several factors support the trial court's conclusion that the crane in this case was not defective or unreasonably dangerous as a matter of law because it lacked an ATB device. First, it is uncontested that Hilliard was aware of both the risks of two-blocking and the fact that this particular crane did not have an ATB device. In fact, the evidence presented at trial demonstrated that virtually everyone in the crane industry was well acquainted with the danger of two-blocking. When there is no question that the plaintiff was aware of the particular risk and of the fact that no safety device was present, there is no strict liability for failure to provide the device as a matter of law. S.C.Code Sec. 15-73-20; Tisdale v. Teleflex, Inc., 612 F.Supp. 30, 39 (D.S.C.1985).
 
 
 20
 Second, the undisputed evidence also shows that at the time of its manufacture, the crane conformed to all relevant industrial standards. Plaintiffs conceded that most cranes manufactured for sale in the United States during the late 1970s did not incorporate an ATB device. Nor did any state or federal regulations require an ATB device on a crane of this sort. In sum, the trial court correctly found that ATB devices, while perhaps a useful option for cranes of this type, were not mandatory safety equipment at the time of manufacture and sale.* Because the ATB safety feature was beyond what a consumer would have expected at the time, the crane was not unreasonably dangerous. See Young v. Tide Craft, Inc., 242 S.E.2d 671, 679-80 (S.C.1978).
 
 
 21
 Moreover, even though JMOL was granted on the claim of unreasonable dangerousness, it is apparent that the jury nevertheless heard and considered plaintiffs' contentions regarding the lack of an ATB device in the context of the warranty claim. As noted above, plaintiffs attempted to argue that it was a combination of flaws that led to the accident here. The jury heard extensive testimony about ATB devices, the dangers of two-blocking, and the particular circumstances of this two-blocking accident. After hearing this evidence, the jury dismissed the warranty claim against Manitowoc. Much the same questions of "defectiveness" were present in both contexts. See Claytor, 286 S.E.2d at 132. Because of this overlap between the two claims, the fact that plaintiffs' strict liability argument did not also go to the jury is not a basis for a new jury trial.
 
 IV.
 
 22
 For the foregoing reasons, the judgment of the district court is
 
 
 23
 AFFIRMED.
 
 
 
 *
 Plaintiffs point to the decision in Marchant v. Lorain Division of Koehring, 251 S.E.2d 189 (S.C.1979) (Marchant II ), which held that the question of whether a crane was unreasonably dangerous because it lacked an ATB device amounted to a jury issue. That case, however, presented a much closer question of strict liability. The industrial standards there affirmatively required an ATB device on the type of crane at issue, and it was not established that the plaintiff was aware of the risks of two-blocking. Id. at 192